UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MAR-RAE TERINO,           \* | |
| Plaintiff                    \* | |
|                         \* | |
| v.                      \* | Case No.  2:15-cv-00143 |
|                         \* | |
| THE WOODSTOCK RESORT CORP. and   \* | |
| WTS INTERNATIONAL INC.,      \* | |
| Defendants             \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN SUPPORT OF WTS INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT

## I.   Preliminary Statement

On July 31, 2015, Plaintiff, Mar-Rae Terino ("Terino") filed an amended fourteen count complaint, alleging retaliation under the federal Medical Leave Act ("FMLA") and various common law and statutory claims under Vermont law, all arising out of her employment by WTS International, Inc. ("WTS") as a nail technician and aesthetician at the Spa at the Woodstock Inn ("the Spa"), owned and operated by the Woodstock Resort Corp. ("Woodstock").

Terino quit without notice to WTS on April 7, 2012 after returning to work on February 14, 2012 with restrictions from a workplace injury that occurred on or about January 28, 2012. For the reasons set forth herein, WTS is entitled to judgment in its favor on each of Terino's claims.

## II.   Standard of Review

A motion for summary judgment must be granted where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might

affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137* (2d Cir.2009). In considering summary judgment, the Court construes the evidence "in the light most favorable to the nonmoving party, and draw[s] all inferences and resolv[es] all ambiguities in favor of the nonmoving party." *Doro v. Sheet Metal Workers' Int'l Ass'n, 498 F.3d 152, 155* (2d Cir.2007).

## III.   Argument

### A.   WTS Is Entitled To Judgment On Terino's Claim of Willful Interference Under Vermont's  Parental Family Leave Act

In Count I of her First Amended Complaint ("Complaint"), Terino alleges that WTS interfered with her rights under the Vermont Parental Family Leave Act ("PFLA").[1] The alleged interference under the PFLA appears to be that Terino gave notice to Michelle Adams ("Adams"), Spa Director, that she was unable to work full-time between February 6, 2012 and February 14, 2012; that while Terino was out on leave, Adams completed  an "Absence and Substitute Request Form" which did not contain a box to check for FMLA or other medical leave; that the omission of a box to check FMLA or other medical leave on this form was "willful and malicious;" and that WTS did not notify her of her eligibility for medical leave when she reported "mental health issues" on February 23, 2012 and April 7, 2012. Complaint, ¶¶98-115.  WTS is entitled to judgment in its favor on Terino's claims for interference under the PFLA.

### (1) There Is No Cause of Action for Interference Under the PFLA

Unlike the FMLA, the PFLA does not expressly create a cause of action for

---

[1] Terino's claim for interference with her rights under the FMLA set forth in Count I is barred by the statute of limitations.  *See* Opinion and Order ("the Order") issued December 22, 2015 (Doc. 24).

"interference," *compare* 29 U.S.C §2615(a), and there are no state or federal cases limning the elements of an interference claim under the PFLA.  Even assuming such a cause of action exists notwithstanding the lack of any statutory language, Terino would still be required to demonstrate that she was (1) an eligible employee under the PFLA; (2) WTS was a covered employer under the PFLA; (3) she was entitled to leave under the PFLA; (4) she gave notice of her intent to take leave under the PFLA; and (5) she was denied benefits to which she was entitled under the PFLA. *See* Order at 5, citing *Geromanos v. Columbia University*, 322 F. Supp. 2d 420, 426 (S.D.N.Y. 2004). Because Terino was not an eligible employee at the time she took medical leave; did not give written notice of her intent to take leave as required by the PFLA; and was not denied benefits to which she was entitled, WTS is entitled to judgment in its favor on Terino's interference claim.

**2.      Terino Was Not An Eligible Employee Under the PFLA**

In order to be an eligible employee under the PFLA, Terino must show that at the time of her requested leave, she had been continuously employed by the same employer for a period of one year for an average of at least 30 hours a week.  *Rowley v.  UHS of Sutton, Inc.*, 2011 U.S. Dist. LEXIS 2745 at *8-9 (D. Vt. 2011), citing 21 V.S.A. §471(2).  Whether an employee is a protected employee under the PFLA is determined by the individual's status at the time of taking leave. *Id.*, citing *Woolhaver v. State*, 2003 Vt. 71, ¶¶ 13, 14, 175 Vt. 397, 833 A.2d 849.

Terino first sought to take leave for the workplace injury she sustained on January 28, 2012 on the day of the accident when she informed Adams that she would be out of work until February 6, 2012.  Complaint, ¶¶82-83.  Terino's earning statements from WTS for the pay period ending January 29, 2011 through the pay period ending January 28, 2012 evidence that she worked 1377.78 hours in that twelve month period prior to taking leave, or slightly less than an average of 26.5 hours per week. Statement of Material Facts ("SMF"), ¶¶ 6, 10.  If her hours

are averaged from the date upon which Terino first began working for WTS, she averaged less

than 27.96 hours per week. SMF, ¶6.  Even if her accrued paid time off as of January 28, 2012

of 11.54 hours is included,[2] as *Woolhaver* requires, Terino's hours do not average 30 hours per

week during the twelve months prior to her injury. SMF, ¶22. She therefore cannot establish that

she was protected under PFLA.[3]

Terino has the burden of proof on the issue of eligibility. *Rowley v.  UHS of Sutton, Inc.*,

2011 U.S. Dist. LEXIS 2745 at *14 (D. Vt. 2011).  Terino never challenged any of her Earnings

Statements.  SMF, ¶11.  Although she claims that she worked off the clock,[4] she never provided

WTS with any records supporting the hours she allegedly worked at home, and she was unable to

estimate the amount of those hours. *SMF, ¶50.*[5]  Terino cannot establish that she was an eligible

employee under the PFLA.

### 3. Terino Failed to Give the Requisite Notice Under the PFLA

As Terino admitted, WTS informed Terino of her rights and obligations under the FMLA

in its Associate Handbook. SMF, ¶21.  She knew that WTS denied her FMLA leave by letter

dated February 8, 2012 shortly after her injury. SMF, ¶19.   She admitted that she reviewed the

letter with her counsel, and that at no time after her receipt of the letter did she discuss the letter

with Adams,  request any personal or other leave with Adams, or inquire of Adams whether any

other type of leave was available to her. SMF, ¶19.  Even after consulting with her attorney about

---

[2] *See* SMF, ¶22.

[3] Although not dispositive, it is not clear whether Terino satisfies the "continuously" requirement as she testified that applied for and received unemployment compensation benefits from the State of Vermont when the Spa closed for approximately a month following Hurricane Irene.  Terino Dep. at 62-63.

[4] This would be a violation of WTS' policy.  SMF, ¶9.  WTS employees are allowed to work at home, but are expected to provide WTS to records of their time so that they can be properly paid.  *Id.*

[5] To establish eligibility under the PFLA, Terino would have to prove that she worked over 160 hours at home or otherwise off the clock.

the February 8, 2012 letter, she did not at any time ask WTS for any other type of leave. *Id.* at

141

At no time did Terino give WTS "reasonable written notice of intent to take leave" for a

"serious illness," as defined by PFLA.  *See* 21 V.S.A § 472 (e); *see, also, e.g., Hahn v. Office &*

*Professional Employee International Union, Local 153*, 2016 U.S. Dist. LEXIS 96581 (S.D.N.Y

2016) citing *Wahl v. City of Suffolk*, 466 F. App'x 17, 20 (2d Cir 2012) ("A plaintiff fails to

exercise rights protected under the FMLA when the employee does not explicitly invoke the

FMLA.")  Even she could establish her eligibility under the PFLA and even if her knee and ankle

sprain constituted a "serious illness" entitling her to protected leave under the PFLA,[6] Terino's

failure to exercise or attempt to exercise any rights under the PFLA is fatal to any interference

claim.

### 4.  WTS Did Not Deny Terino Any Benefits to Which She Was Entitled Under the PFLA

The PFLA requires an employer to offer an employee who returns from PFLA protected

leave the same position with "equivalent employment benefits, pay, and other terms and conditions

of employment." 21 V.S.A. 472(f). An employer is not required to provide an employee any right,

benefit or position to which the employee would not have been entitled had the employee not taken

leave. *Cheney v. New England Newspapers, Inc.* 2014 Vt. Super LEXIS 40 at *10 (Vt. Super

2014). To maintain her status as a full-time employee of WTS eligible for benefits, Terino was

expected to work an average of 35 hours per week. The change in her employment status upon her

return from leave from full-time to part-time, and the resultant loss of her eligibility for group

health insurance benefits, was necessitated by her physicians' restrictions on the number of hours

---

[6] The notes provided by her physicians prior to her return to work did not specify her condition, or state whether it
constituted a "serious illness" as defined by 21 V.S.A § 471 (5).

she could work, and did not constitute a denial of her rights under the PFLA. Terino never complained about the reduction in the number of hours she was scheduled to work upon her return from medical leave, only how those hours were scheduled. SMF, ¶30.

### B.  WTS Is Entitled to Judgment on Terino's Claims of Retaliation Under the FMLA and the PFLA

To state a *prima facie* case of retaliation under the FMLA, Terino must show (1) she was engaged in statutorily protected activity; (2) WTS knew she was exercising her FMLA rights; (3) she suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action.  *Polenza v. City of New York*, 365 F. 3d 165, 168 (2d Cir. 2004).[7]  For purposes of an FMLA retaliation claim, an "adverse employment action" is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights."  *Millea v. Metro-North Railroad, Co.*, 658 F.3d 154,164 (2d Cir. 2011).[8] Similarly, Title 21, § 473 prohibits an employer from discharging or in any other manner retaliating against an employee who, *inter alia*, lodges a complaint of a violation of the PFLA.

### (1)    WTS is Not a Covered Employer Under the FMLA

The FMLA notice provided to Terino by WTS on or about February 8, 2012 informed her that she was not entitled to FMLA leave because WTS did not employ at least fifty (50) employees within a 75 mile radius of the Spa.  SMF, ¶19. It is undisputed by Terino that as of

---

[7] Although a claim for retaliatory termination may be pursued under either an "interference" or a "retaliation" theory, this Court has ruled that Terino's FMLA interference claim is time barred.  To prevail on a retaliation theory, Terino must show that WTS acted intentionally, *i.e.*, that it took adverse action against Terino "specifically because [she] invoked [her] FMLA rights"  *See, e.g., Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 282 (6th Cir. 2012).

[8] *The Burlington Northern* Standard adopted in *Millea* distinguishes between "significant" and "trivial" harms: "[P]etty slights, minor annoyance, and simple lack of good manners will not "give rise to an actionable retaliation claim." *Id.* at 165.

January 28, 2012, WTS did not employ fifty employees at the Spa. SMF, ¶20.  Terino seeks to avoid this obvious bar to her FMLA claim by arguing that defendants WTS and Woodstock are "joint employers" under the Act. *See, e.g.,* Complaint ¶15. Her reliance on the "joint employer" doctrine is misplaced as this doctrine *cannot* be used to aggregate the total number of employees of each employer to reach the FMLA threshold.  *Hahn v. Office & Professional Employees International Union, Local 153*, 2016 U.S. Dist. LEXIS 96581 at *8 (S.D.N.Y. 2016) and cases cited.

Under the FMLA, distinct entities will be deemed a single employer, a theory not alleged by Terino, allowing the aggregation of their employees, *only* if, under the "totality" of the entire relationship," the entities satisfy the "integrated employer" test. *Id., citing* 29 C.F.R. §825.104(c)(2); *see also Rokuson v. Century Empire Szechuan Restaurant, Inc.*, 2015 U.S. Dist. LEXIS 44103 (E.D.N.Y. 2015). Separate employers may be considered a "single integrated" employer based on an evaluation of these factors: (1) interrelationship of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Brown v. Daikin America, Inc.,* 756 F. 3rd 219, 226-227 (2d Cir. 2014). Of these factors, control of labor relations is the central concern. *Id. citing Murray v. Miner,* 74 F. 3rd 402, 404 (2d. Cir. 1996); *see also, Shiflett v. Scores Holding Co., Inc.*, 2015 U.S. App. 2483 at *3 (2d. Cir. 2015) (Summary Order). Here, there is insufficient evidence from which a reasonable jury could conclude that Woodstock exercised 'sufficient control over the terms and conditions of [Terino's] employment to be deemed her employer under the FMLA.*Daikin,* 756 F. 3rd at 228, *citing Parker v. Columbia Pictures Industries*, 204 F. 3rd 326, 341 (2d Cir. 2000).

The evidence is undisputed that WTS and Woodstock executed a Leisure Facility Agreement on or about July 2, 2009 in anticipation of opening the Spa owned by Woodstock on

or about September 10, 2010, pursuant to which WTS (1) recruited, hired and trained the Spa employees; (2) developed the Employee Handbook, Training Manual and Service Protocol Manuals for the Spa; (3) created staffing chart and staff compensation plan for the Spa ("Pre-Opening Services"), and thereafter managed the day to day operations of the Spa ("Management Services").  SMF, ¶55.   The Agreement specifically provided that all persons engaged to work at the Spa would be WTS employees; and that WTS, in its sole discretion, had the authority to recruit, hire supervise, manage, discipline and discharge its employees. SMF, ¶_____.

Terino completed a WTS job application for the position of nail technician and aesthetician at the Spa.; was offered the positions of aesthetician and nail technician by WTS on August 16, 2010; received her first and only performance evaluation from WTS; and was paid for her services only by WTS; SMF, ¶¶1, 2, and 10.

Terino was trained by WTS and received only WTS' Employee Handbook.  SMF, ¶3. She admitted Adams, as the Spa Director, was responsible for scheduling her work. SMF, ¶5. Following her injury in the parking lot owned by Woodstock, she filed her workers' compensation claim was filed against WTS, and not Woodstock. SMF ¶53. Her personnel records were maintained by WTS and that the only alleged disciplinary action (verbal coaching) she received was administered by WTS and her medical insurance was provided through WTS's group plan. SMF, ¶¶5-10, 36.  She has no knowledge that any member of Woodstock's Board of Directors served on WTS' Board, and no personal knowledge that Woodstock had any financial interest in WTS. SMF, ¶55.   Her only evidence that Woodstock and WTS were a "single integrated employer" was that Spa employees occasionally attended Woodstock's staff meetings,

for which they were paid by WTS and that the Spa employees were granted certain privileges by Woodstock to use the  facilities at the Woodstock Inn. SMF ¶56, 57.[9]

None of the "evidence" Terino has produced in this case is "akin to handling job applications, approving personnel status reports, [or] exercising veto power over major employment decisions," activities which the Second Circuit has held to constitute evidence of centralized control of labor relations.  *Parker v. Columbia Pictures Indust.,* 204 F. 3rd at 341. Accordingly, Terino cannot raise a genuine issue of material fact whether WTS and Woodstock are a single "integrated employer," permitting aggregation of their employees for purposes of FMLA coverage.

### (2) Even if Terino Could Establish that WTS Was A Covered Employer Under the FMLA, Any Claim of Retaliation Under the FMLA Other Than Her Alleged Constructive Discharge is Barred By The Statute of Limitations

The only alleged retaliation by WTS within the FMLA's three year statute of limitations for a willful violation is Terino's alleged constructive discharge on April 7, 2012.  *See* order at p. 17.  Accordingly, even if WTS is a covered employer under the FMLA, Terino's FMLA retaliation claim fails as a matter of law if WTS is entitled to judgment in its favor on constructive discharge. *See, e.g., Dansby v. City of New York*, 2016 U.S. Dist. LEXIS 102872 at * 17-18 (S.D.N.Y. 2016), and cases cited (declining to adopt "continuing violation" doctrine in FMLA cases).  A resignation cannot constitute a materially adverse employment action for purposes of an FMLA retaliation claim unless the plaintiff was constructively discharged.  *Davis v. Koffee Kup, Bakery, Inc.*, 2016 U.S. Dist. LEXIS 109664 at *17-18 (D.Vt. 2016).

### (3) Because Terino Can Not Establish that She Was Constructively Discharged on April 7, 2012,  Her FMLA Retaliation Claim Is Barred By the Statute of Limitations

---

[9] Documents tabbed as "Joint Employer" were produced by Terino on or about November 22, 2016 in response to WTS' Request for Production.

To find that an employee's resignation amounted to a constructive discharge, the "trier of fact must be satisfied that ….a reasonable person in the employee's shoes would have felt compelled to resign." *Davis v. Koffee Kup Bakery, Inc.*, 2016 U.S. Dist. LEXIS at *18 (D. Vt. 2016), *citing Whidbee v. Garazelli Food Specialities, Inc*., 223 F. 3rd 62, 73 (2d Cir. 2000). To establish a constructive discharge, Terino must show that her employer "deliberately made [her] working conditions so intolerable that [she] was forced into an involuntary resignation." *Morris v. Schroeder Capital Management International*, 481 F. 3rd 86, 88-89 (2d. Cir. 2007), *citing Pena v. Brattleboro Retreat,* 702 F. 2d 322, 325 (2d. Cir. 1983). The "standard for evaluating constructive discharge is objective, and 'it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.'" *Audsley v. RBS Citizens Bank, N.A.,* 2012 U.S. Dist. LEXIS 132253 at * 15 (D. Vt. 2016), *citing Slater v. Town of Exeter*, 2009 U.S. Dist. LEXIS 22841, 2009 WL 737112 at *6 (D.N.H. 2009).

Terino's testimony regarding her working conditions at the Spa from February 14, 2012, when she returned to work until April 7, 2012 when she submitted her resignation, viewed in the light most favorable to her, does not establish that she was forced to resign. On or about February 23, less ten days after Terino returned to work at the Spa following her injury, she met, at her request, with Adams and Ramsey.[10]  SMF, ¶31.  Terino complained about "[e]verything that was going on with my schedule, with Michelle, with feeling like they weren't helping me with all of my duties being accommodating." *SMF, ¶*34.  Immediately prior to that meeting, Terino had obtained a doctor's note which precluded her from doing any pedicures, climbing stairs, and from working any more than four hours a day, three days a week "until further notice."  SMF, ¶33. Between February 14, 2012 and April 7, 2012, Terino's work restrictions

---

[10] Ann Tucker from Woodstock participated by telephone because Terino had requested an HR representative be present, and Shelley Piedmont, WTS' Director of Human Resources, was not available. SMF, ¶32.

were changed frequently by her doctors, and Terino informed Adams of those changes because she knew Adams had to work around her work restrictions in order to schedule her appointments with clients. SMF, ¶26.

Shortly after the February 23, 2012 meeting, Terino went on a ten day vacation to Jamaica with her fiancé.  SMF, ¶35.   No reasonable jury could conclude that the frequent changes to Terino's schedule made to accommodate her work restrictions and an extended vacation over a six week period made her frequently changing working conditions so intolerable that a reasonable person in her shoes would have felt compelled to resign.

Terino came to work early on April 7, 2012, and a client was already waiting for her. SMF, ¶39.   Although Terino alleged in her Complaint that WTS employees would falsely tell her appointments started later than scheduled to make her a "no-show" and get her fired, the only incident she could recall occurred on April 7, 2012, which she admitted was the reason she quit her job that day. SMF, ¶41. Terino has *no* evidence that Adams was involved in the change in her schedule, or that the failure to notify Terino of a last minute appointment was intentional. SMF, ¶42.

Although Terino may have been frustrated with her limited schedule necessitated by her work restrictions, she had no competent evidence that Adams or anyone else maliciously manipulated her schedule to force her to quit. As a matter of law, she was not constructively discharged, and her FMLA retaliation claim based on her termination fails. *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F. 3rd 62, 73 (2d Cir. 2000).

### 4.    Terino Did Not Engage in Any Protected Activity Under the PFLA

As set forth above, Terino did not exercise or attempt to exercise any rights under the PFLA. SMF, ¶21.   She did not raise any complaints in the meeting on February 23, 2012

regarding the denial of leave or of any other rights under the PFLA. SMF, ¶34-35.   Because WTS had already informed Terino she was ineligible for FMLA leave on February 8, 2012, it had no obligation to give her any further notice of her eligibility for FMLA leave due to her assertion of "mental health" issues in the February 23, 2012 meeting. *See* Order at 10. To the extent that Terino asserted the need for any leave on her last day of work, her entitlement to any leave ended with her employment. *Id.*  Because Terino did not engage in any protected activity under the PFLA, her claim for unlawful retaliation under 21 V.S.A. 473 fails.

### C.  WTS Did Not Discriminate Against Terino On The Basis Of Her Race

In Count III of her Complaint, Terino claims that she was discriminated against on the basis of race in violation of the Vermont Fair Employment Practices Act ("FEPA") when she was not hired for a wedding coordinator position in 2010 or promoted to the "lead therapist positon" at the Spa in November of 2011.  *See* Complaint, ¶¶51-61[11]

In the fall of 2011, WTS determined that it would consolidate the cosmetology lead and massage therapist lead into a single position, and offered it to D'Hooghe, who had experience running her own spa and was a licensed massage therapist. SMF, ¶13.

Terino has no competent evidence that the failure to offer her the lead therapist position was on the basis of her race.  Terino acknowledges that the two decision-makers were Adams and D'Hooghe.  SMF, ¶14.   Terino cannot dispute that Adams originally hired her and then promoted her to a full-time position.  SMF, ¶¶2, 48.  Similarly, she cannot dispute D'Hooghe gave her a very favorable evaluation on September 28, 2011.  SMF, ¶14. No one at the Spa, including either decision maker, ever made any discriminatory remarks regarding Terino.  SMF, ¶14.  Tellingly, even after being told in November of 2011 that the lead cosmetologist position

---

[11] Terino does not allege, and nor can she prove that WTS ever posted or sought to hire a wedding coordinator for the Spa.

had been eliminated, *see* Complaint at ¶¶58, 60, Terino expressed continued interest in being considered for a role in management, in an email thanking Adams for "always being supportive" and praising the Spa "as the best Spa I have ever worked for."  SMF, ¶15.

In short, WTS has articulated a legitimate, non-discriminatory reason for its not "promoting" Terino, specifically, its decision to consolidate the two lead positions in November of 2011.  Terino cannot adduce any evidence that this reason was a pretext for unlawful discrimination on the basis of race.  *Boulton v. CLD Consulting Engineers*, 2003 Vt. 72, 175 Vt. 413, 421; 834 A.2d 37 (Vt. 2003).  In the absence of any competent evidence of pretext, *see Harding v. Wachovia Capital Markets, LLC*, 341 Fed. App. LEXIS 18319 (2d Cir. 2013), WTS should be granted judgment in its favor on Count III.

### D.  Terino's  Disability Discrimination and Hostile Work Environment Claims Fail Because

#### 1.  Terino Did Not Have A Qualifying Disability

Count IV purports to allege a claim for disability discrimination and hostile work environment in violation of FEPA. Unquestionably, it is unlawful for an employer to discriminate against a qualified disabled individual. 21 V.S.A. §495(1).[12]  Part of Terino's *prima facie* case is to show that she is a "qualified disabled individual."  *Id.*  FEPA defines an individual with a disability as person who "has a physical or mental impairment which substantially limits one or more major life activities." 21 V.S.A. §495(d) (5).[13]  Terino admitted that the only "disability" for which she sought workplace accommodations from WTS was the foot, knee and ankle sprain she suffered as a result of her fall on January 28, 2012.  SMF, ¶25.

---

[12] A claim of disability discrimination under FEPA is analyzed under the same framework as federal claims under the ADA.  *Connors v. Dartmouth Hitchcock Medical Center*, 2013 U.S. Dist. LEXIS 96709 at*19-20 (D. Vt. 2013).

[13] This is similar to the determination employed in ADA prior to its amendment by the Americans with Disabilities Act Amendments.

These temporary injuries that Terino sustained on January 28, 2012 do not trigger the protection of the ADA, and by implication, Vermont's FEPA.  *See, e.g.*, *Shaugnessy v. Xerox Corp.*, 2015 U.S. Dist. LEXIS 39537 at *8 and cases cited (W.D. NY 2015) ("It is well settled that temporary, non-severe injury does not constitute a disability under the ADA because such an injury does not substantially impair the person suffering the injury."); *Clark v. Boyd Tunica, Inc.*, 2016 U.S. Dist. LEXIS 25223 at *9-10 (N.D. Miss. 2016) (plaintiff, who fractured ankle, and who was not cleared to return to work without restrictions for five months, was not "disabled" even under the more liberal ADAAA); *Chen v. Oschner Clinic Foundation*, 2014 U.S. Dist. LEXIS 167300 at *22-24 (E.D. LA 2014).  (Plaintiff who returned to work two months after sprained ankle, with some instability and discomfort did not demonstrate qualifying disability); *Gleason v. Food City 654*, 2015 U.S. Dist. LEXIS 52558 (E.D. Tenn 2015) (plaintiff who missed a few days of work after fall which caused contusions and back strain, and returned to work with temporary lifting and standing restrictions was not "disabled").

 Because Terino cannot demonstrate that her knee, ankle and foot sprain constituted a qualifying disability under FEPA, she cannot establish a *prima facie* case of disability discrimination under FEPA, and WTS is entitled to judgment in its favor.

### 2.  There Was No Actionable Discrimination On The Basis Of Disability

Moreover, Terino made her first and only claim of disability discrimination in the meeting on February 23, 2012. SMF, ¶34. She complained about "everything that was going on with my scheduling, with Michelle, with feeling pressure, with feeling like they weren't helping me with all of my duties being accommodating." SMF, ¶34.  Although Terino objected to Adams "constantly" changing her schedule, she admitted that her doctors frequently changed her work restrictions. SMF, ¶26.  Although, Terino asserted in the meeting she was under "a lot of stress

14

from work," Terino Dep at 186-187, but admittedly did not request any accommodation for any "mental health issues" at that time. SMF, ¶35.[14]

Thus, even if Terino could establish that she had a qualifying disability, she cannot prove that WTS breached any duty to provide reasonable accommodations.  WTS, acting through Spa Director Michelle Adams, worked with Terino to (1) accommodate work restrictions which changed almost weekly, (2) the needs of the Spa's customers and (3) the schedules of the other Spa employees. SMF, ¶27.  A qualified individual with a disability is entitled to reasonable accommodations, and not necessarily to the accommodation of his or her choice. *Noll v. IBM,* 789 F. 3rd 89, 95 (2d Cir. 2015). WTS provided Terino with the accommodations mandated by her physician's notes, and thus satisfied any obligation of reasonable accommodation.  Nor can Terino establish that any actions by Adams or WTS created an objectively hostile work environment based upon her alleged disability. *Davis v. State of Vermont,* 868 F. Supp. 2d. 313, 327-328 (D. Vt. 2012).

### E.  There Was No Unlawful Retaliation By WTS Under FEPA

In Count V, Terino asserts a claim of retaliation based on the "aforementioned discrimination," presumably the discrimination alleged in Counts III and IV. To prevail on her claim for unlawful retaliation, Terino must show that she engaged in a "protected activity," as defined in 21 V.S.A. §495(a) (5); that her employer was aware of that activity, and that there was a causal connection between the protected activity; that thereafter she was subjected to a material adverse employment action; and that there was a causal connection between her protected

---

[14] As this Court has already ruled, Terino would not have been entitled to any accommodation for her stress and/or depression requested on the day she terminated her employment.  Order at pp. 10.

activity and an adverse employment action.  *Davis,* 868 F. Supp.  2d. at 331, *citing Lowell v. IBM,* 955 F. Supp. 300, 304 (D.Vt. 2004).

The only arguably protected activity in which Terino engaged involved her complaint on or about February 23, 2012 about the failure to receive requested accommodations from WTS. SMF, ¶34. [15] The only adverse employment actions allegedly taken against Terino for her complaint on February 23, 2012 is her "write up" by Michelle D'Hooghe on February 28, 2012 for not performing her closing checklist duties, and the alleged effort to make her a "no show." Complaint ¶¶ 152-155; 165-166.  The verbal coaching by D'Hooghe did not constitute discipline under WTS' policy, SMF, ¶36, and, as indicated *infra* at pp. 11, the scheduling mix-up on April 7, 2012 was not intentional, and constitute a materially adverse employment action. SMF, ¶¶39-42.

Because Terino cannot establish a causal connection between her complaints on February 23, 2012 and any adverse employment action taken by WTS following her complaint prior to her resignation on April 7, 2012,[16] Terino's claim for retaliation by WTS under FEPA fails a matter of law.

### F.  There Was No Retaliation By WTS Against Terino For Filing A Workers Compensation Claim.

The elements of the statutory retaliation claim are straight forward.  *Lowell v. IBM Corp.*, 955 F. Supp. 300, 305 (D. Vt. 1997); *see also* 21 V.S.A. § 710 (b).  Terino claims that WTS "forced" her to use sick time in violation of the Workers Compensation Act and that WTS terminated her health insurance benefits. *See*, *e.g.* Complaint, ¶¶ 128, 129.

---

[15] Terino does not allege, nor can she prove that she complained about the alleged racial discrimination to WTS.

[16] Terino was told she could not continue apprenticing an employee *prior* to any protected activity. Complaint, ¶116.

Upon notification by WTS that she was not eligible for FMLA leave, Terino consulted with counsel.  SMF, ¶19.  Terino filed her workers' compensation claim, and approximately two weeks after her injury she began receiving payments from Travelers Insurance Company.  SMF, ¶23.  All of Terino's medical expenses pertaining to her work related injury (other than an alternative acupuncture treatment) were paid for by the workers' compensation coverage.  SMF, ¶37.  She also received salary continuation through workers' compensation up to the maximum amount.  SMF, ¶38.

Following her injury, Terino was classified to part-time status on February 14, 2012, based upon the work restrictions imposed by her physician to which Terino acknowledged WTS needed to adhere in order for her to receive workers compensation benefits.  SMF, ¶26. On February 9, 2012, Adams applied Terino's accrued PTO of 11.54 hours to pay her for her absence due to her injury on February 2, 2012 and February 3, 2012.  SMF, ¶22.   Terino approved the application of her PTO in writing.  *Id.*  There is no bar under Vermont Workers' Compensation Act to allowing an employee to use PTO to cover an absence prior to the commencement of the receipt of workers' compensation benefits.  *See, e.g.*, 21 V.S.A. §643(b)(c).[17] Had Terino refused to authorize the application of the PTO, she would not have received pay for those two days, which she accepted without objection over four years ago. SMF, ¶22.

Under WTS' group health insurance plan, medical insurance is available only to full-time employees. SMF, ¶48.  Upon a change in full-time status, employees are entitled to continue coverage for a limited period of time under COBRA.  *Id.*  The termination of Terino's

---

[17] ("Upon reinstatement, an injured worker shall regain seniority and any unused annual leave, personal leave, sick leave or compensatory time he or she was entitled to prior to the interruption in employment *less any leave and compensatory time used during the period of interruption*.") *(emphasis added).*

group health insurance was pursuant to the terms of the group plan governed by ERISA, and was wholly out of WTS' control. *Id.* Despite written notice that her health insurance benefits were ending, Terino, relying on the advice of counsel, did not elect to continue her coverage through COBRA, or contact the administrator of the benefit plan regarding continuation of coverage. SMF, ¶21. Terino cannot establish that her filing of a workers' compensation claim was the "but for" cause of the termination of her group health insurance benefits.

Other than Terino's speculation that Michelle Adams and other unidentified employees were angry about her filing of worker's compensation claim because it would cost WTS money, *see* Complaint ¶137, Terino has no evidence that WTS intentionally interfered with her receipt of workers' compensation benefits, or otherwise retaliated against her, *because* she filed a workers' compensation claim. WTS is entitled to judgment in its favor on Count VI of Terino's Complaint.

### G.  WTS Is Entitled To Judgment In Its Favor on Terino's Claim of Intentional Infliction of Emotional Distress

The standard for proving intentional infliction of emotional distress is high: to prevail, plaintiff must show "outrageous conduct, done intentionally or with reckless disregard of the probably of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Baldwin v. Upper Valley Services, Inc.* 162 Vt. 51, 664 A2d 316 ( Vt. 1994); *Crump v. P&C Food Markets, Inc.,* 154 Vt. 284, 296, 576 A.2d 441, 1990 Vt. LEXIS 65, (Vt. 1990), *citing Birkenhead v. Coombs,* 143 Vt. 167, 174-75, 465 A.2d 244, 247 (1983).  Mere termination of employment is insufficient as a matter of law. *Id.* Terino cannot, as a matter of law, demonstrate that any of the alleged acts or omissions of WTS approached the legal standard for "outrageous conduct" necessary to prevail on this claim. *See Woodstock Resort Corp. v. Scottsdale Ins. Co,* 927 F. Supp. 149, 156, 996 U.S. Dist.

LEXIS 7598 and cases cited (D. Vt. 1996) *Baldwin v. Upper Valley Services, Inc.,* 161 Vt. 51, 644 A.2d 316, 994 Vt. LEXIS 481 and cases cited at *56-57 (Vt. 1994).  To be actionable, the conduct must exceed "all possible bounds of decency" and be regarded as "atrocious and utterly intolerable in a civilized community."  *Baldwin* at 56-57 Conduct in the employment context rarely rises to the required level or outrageousness.  *Moore v. Marriott International, Inc.*, 2014 U.S. Dist. LEXIS 15914 *55 (D. Arizona 2014).  In addition, the resulting emotional distress must be "extreme."  *Id.*

A supervisor's effort to accommodate an injured employee's work restrictions and WTS' enforcement of its employee policies regarding leaves and benefits cannot, without more, amount to the intentional infliction of emotional distress.  *See, e.g., Moore v. Marriott International, Inc.*, 2014 U.S. Dist. LEXIS 154914 at *36(D. Arizona 2014). (Facts did not support plaintiff's claim that discipline for her disability, the defendants' failure to grant her requests for accommodation, and her treatment compared to non-disabled massage therapists at defendant's spa rose to the level of extreme and outrageous conduct); *Violan v. Ok Lok Seminar Health Services*, 2013 U.S. Dist. LEXIS 182141 at *41-42 (N.D. Cal. 2013) and cases cited;  *Shivakumar v. Abbott Labs*, 2001 U.S. Dist. LEXIS 9628 at *34-35 (N.D. Ill. 2011) and cases cited. Nor can Terino cannot establish that she suffered severe and extreme emotional distress proximately caused by WTS' conduct.  She has sought no counselling or other treatment for her alleged emotional distress other than marital counselling in the spring of 2015, which she sought because her ex-husband was abusive to her. SMF, ¶46.  Terino has disclosed no experts, treating or otherwise, to support her claims of severe emotional distress.  SMF, ¶47.

### H.  WTS Is Entitled to Judgment on Terino's Claim Of Breach of The Implied Contract and Covenant of Good Faith and Fair Dealing

In Count VIII of her Complaint, Terino alleges that "Defendants' employee handbook, policies and practices" constituted an implied employment contract, which included a covenant of good faith and fair dealing. Terino makes no factual allegations identifying which of the handbook provisions cited in her Complaint at ¶¶ 34-50 were breached or how they were breached, other than the failure to give her an exit interview. Terino admitted in her deposition that the only term of any alleged implied contract of which she was aware was based upon the "application information and the HR information," which she understood meant she was an employee at will. SMF, ¶3. The Handbook disclaims any intent to create any relationships other than employment at will. SMF, ¶3. Terino admitted that her at-will relationship with WTS was never modified. ; *see Sargent v. Colombia Forest Products, Inc.* 1994 U.S. Dist. LEXIS 21033 at *7 (D. Vt. 2014) ("The terms of a handbook will modify an at will agreement *only* where the employee and employer negotiated over the terms of the handbook, or the parties otherwise manifested an agreement to be bound.")

The only alleged policy that Terino alleges WTS did not follow is the alleged policy set forth in Section 4:28 of the Handbook which provides that "[i]n a voluntary separation situation, WTS International would like to conduct an exit interview to discuss the associate's reason for leaving and any other impressions that the associate may have about WTS International and/or the facility." SMF, ¶3. This guideline, by its plain language, does not create a contractual obligation on the part of WTS to conduct an exit interview or any obligation on the part of a departing employee to submit to an exit interview. Although WTS admittedly did not contact Terino after she quit her job without notice to her supervisor or to WTS management the exit interview policy is not a "definite" policy, which "expressly or impliedly include[d] a promise for specific treatment in a specific situation," and is not enforceable as a matter of contract. *Ross*

20

*v. Times Mirror, Inc.,* 1995 Vt. LEXIS 78 at ***10 (D. Vt. 1995). Because there is no underlying implied contract between WTS and Terino to conduct an exit interview, there can be no breach of the implied covenant of good faith and fair dealing. *Monahan v. GMAC Mortgage Corp.,* 179 Vt. 167, 2005 VT 110, 893 A2d. 298, 316 (Vt. 2005).

### I.   Terino Cannot Prevail On Her Claim of Promissory Estoppel

To state a claim of promissory estoppel, Terino must show that (1) WTS made a promise to her; (2) that WTS should have reasonably expected that the promise would induce action or inaction by the plaintiff; (3) that the promise actually did induce action or inaction; and (4) that justice requires enforcement of the promise. *Tour Costa Rica v. Country Walkers, Inc.* 171 Vt. 116, 758 A2d 795, 799-800 (Vt. 2000) Terino admitted, under oath, that the only promises that were made to her by WTS was that after her 90 day evaluation, she would be given a full time position with benefits, which she  admittedly received in June of 2011. SMF, ¶48. That admission is dispositive of her promissory estoppel claim.

### J.   Terino Cannot Prevail On Her Negligent Supervision Claim

"The tort of negligent supervision must include as an element an underlying tort or wrongful act committed by the employee. A wrongful act may well be a tort but not necessarily." *Haverly v. Kayteke, Inc.,* 169 Vt. 350, 357 (1990). As with any negligence claim, the plaintiff must meet four elements: "a legal duty owed by the plaintiff, a breach of their duty, actual injury to the plaintiff and a causal connection between the breach and the duty." *Reilly v. Southwest Supervisor of Union,* 2016 Vt. Superior LEXIS 19 (Vt. 2016), *citing Ainsworth v. Chandler,* 2014 Vt. 107, 197 Vt. 541 (Vt. 2014). Here as in *Reilly,* the alleged duty was "to anticipate and guard against the human traits of [defendant's] employees which, unless regulated, are unlikely to harm others." *Id.,* citing *Brueckner v. Norwich Univeristy,* 169 VT. 118, 127 (199). *See* Complaint ¶273.

Terino has no evidence to support her claim that WTS knew or should have known of any harmful traits of any its employees, including Adams or D'Hooghe, and thus no evidence that

WTS breached its duty of care when it hired any of them. SMF, ¶49. Nor does she have any evidence that WTS learned of any "harmful traits" of any of its employees during the time Terino was employed by WTS. SMF, ¶49.[18]  Terino cannot establish a triable issue of fact that WTS breached any duty when it hired, retained or supervised any of its employees. *Reilly v. Southwest Vermont Supervisory Union,* 2016 Vt. Super LEXIS 19 at 23-24 (Vt. Super 2014). Summary judgment must be entered on this claim in favor of WTS.

### K.  Terino Cannot Create A Triable Issue of Fact Regarding her Non-Payment of Wages Claim.

Terino claims, *upon information and belief*, that Adams "routinely" changed her time cards to falsely report that she had worked less time than she had; did not compensate her for work she did at home or for, attending staff meetings and did not pay her for being on call.[19] Complaint ¶62-74 ("Hours Worked"). It is undisputed that Terino was required to punch in and out for work, to complete a "missed punch" card if she did not clock in and out properly, and to review and sign her time card at the end of each week before she could receive her pay check. SMF, ¶7.  She never challenged any of her pay checks and has no competent evidence of any underpayment of wages, and thus she has no evidence of any damages. SMF, ¶11; *see* 21 V.S.A § 395. Finally, Terino's last paycheck was through April 7, 2012, the date upon which she quit. SMF, ¶¶10, 13. She did not file her complaint in this action until on or about April 7, 2015. Accordingly, this claim is barred by Vermont's two year statute of limitations for wage claims. *Ploof v. Brooks Drug, Inc.,* 1991 U.S. Dist. LEXIS 21078 at *24-25 (D. Vt. 1991), citing 12 V.S.A. § 520.

---

[18] Terino's only claim against D'Hooghe is that D'Hooghe suggested to Terino's attorney that she did not believe Terino had been injured in her fall in a telephone interview *after* Terino and D'Hooghe left WTS.

[19] Vermont law is silent on compensation for on call time. *See, e.g.* "A Summary of Vermont Wage and Hour Laws," Vermont Dept. of Labor (revised 2009).

**WTS Has Not Been Unjustly Enriched**

It is settled that "[u]nder a quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable." *Cressy v. Proctor,* 22F.Supp. 3rd 353, 362 (D. Vt. 2014).

As argued above, Terino has no competent evidence of any unpaid wages, and therefore cannot create a triable issue of fact whether WTS was unjustly enriched by the alleged failure to pay her for work she did "off the clock." Similarly, Terino's group health insurance was maintained by WTS through March 1, 2012, and Terino was informed of her rights to continue that coverage under COBRA, which she declined to do. Terino quit on April 7, 2012, so her claim is, at best, for approximately five weeks of unpaid premium by WTS towards her group health insurance. She has no evidence of what WTS paid for her coverage, and therefore cannot prove any unjust enrichment by WTS. SMF, ¶52.

**L.  Terino's Claims for Tortious Interference Fails As She Has No Competent Evidence of Any Unlawful Interference**

Terino claims that unnamed employees of WTS knew of her contracts or "expectancy" with spa product suppliers and intentionally interfered with those contracts or expectancy. *See* Count XIII. In her deposition, Terino admitted that the only WTS employee to whom she referred in Count XIII is Adams, and her only evidence of tortious interference that she had was that a distributor asked her to return product because the owner was friends with Adams. SMF, ¶45.  Terino has no evidence that Adams called the owner of EmerginC and told him not to sell to Terino. SMF, ¶45.  Terino admitted that Jane Iredale, another distributor, did not sell to Terino because she wanted to pay with two different credit cards.  SMF, ¶45. Terino has no evidence that Adams said anything bad to Jane Iredale. SMF, ¶45. She claimed that the distributor of Naturopathic told her that Adams said that she would pull the product from the Spa if product

24

was being sold to Terino, which is inadmissible hearsay. SMF, ¶45. Terino had no contract with Naturopathic and she could not identify any derogatory or disparaging comments made by Adams to Naturopathic. SMF, ¶45.

Simply stated, Terino cannot create a triable issue of fact that WTS "intentionally and improperly induced a third party not to perform its contract with the plaintiff." *Howard Opera House Associates v. Urban Outfitters, Inc.,* 97 F. Supp. 2d 571 at *     (D. Vt. 2000). Finally, Terino cannot establish any harm resulting in non-performance of a contract or from disruption of a relationship or expectancy. *Id.*  WTS is entitled to judgment on its favor on the Count XIII.

### M. Summary Judgment Must Also Be Granted on Count XII

Terino admitted she could not identify any false or disparaging comments that Adams made about the Green Door Spa. SMF, ¶45.  That admission is dispositive of any defamation claim. *Benning v. Corporation of Marlboro College*, No. 2:14-cv-71 (D. Vt. 2014) (Order on Motion to Dismiss).

### IV.    Conclusion

Because Terino cannot demonstrate a genuine issue of material fact and WTS is entitled to judgment in its favor as a matter of law, WTS respectfully requests this Court to grant its Motion for Summary Judgment.

Respectfully Submitted,
WTS INTERNATIONAL INC.
By its attorneys,
JACKSON LEWIS P.C.

Dated:  December 14, 2016                    /s/ Martha Van Oot
                                             Martha Van Oot, VT # 4117
                                             100 International Drive, Suite 363
                                             Portsmouth, NH 03801
                                             E-mail: martha.vanoot@jacksonlewis.com
                                             Telephone: 603.559.2735
                                             Fax: 603.559.2701

## **CERTIFICATION**

I certify that a copy of the within pleading was served this day on the counsel for Mae-Rae Terino and counsel for The Woodstock Resort Corp. by ECF.

Dated:  December 14, 2016                    /s/ Martha Van Oot

4851-3791-0078, v. 1