UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MAR-RAE X. TERINO                    :
       Plaintiff,                  :
                                   :
       v.                          :   Case No. 2:15-cv-00143
                                   :
THE WOODSTOCK RESORT CORP.           :
and WTS INTERNATIONAL INC.,          :
                                   :
       Defendants.                 :


## OPINION AND ORDER

## Introduction

Plaintiff Mar-Rae Terino brings this action against her former employer, WTS International Inc. ("WTS"), and the owner and operator of her former employment site, The Woodstock Resort Corporation. In her initial complaint, Plaintiff brought a single claim of interference with her rights under the Family Medical Leave Act ("FMLA"), arising out of the terms of her employment and eventual resignation from the Spa at the Woodstock Inn after she suffered a work-related injury at her employment location. ECF 7. On December 22, 2015, this Court granted Defendants' motion to dismiss the original complaint on the ground that her claim was untimely, but allowed her leave to amend the complaint so as to allege thirteen new causes of action. ECF 24.

In her amended complaint, Plaintiff asserts the following claims: Interference with medical leave rights under Vermont's Parental Family Leave Act ("PFLA") (Count One); Retaliation under the FMLA and PFLA (Count Two); Racial Discrimination under Vermont's Fair Employment Practices Act ("FEPA" or "VFEPA") (Count Three); Disability Discrimination and Hostile Work Environment under FEPA (Count Four); Illegal retaliation under FEPA (Count Five); Retaliation for filing a workers' compensation claim (Count Six); Intentional infliction of emotional distress ("IIED") (Count Seven); Breach of implied employment contract and covenant of good faith and fair dealing (Count Eight); Promissory estoppel (Count Nine); Negligent hiring, retention and supervision (Count Ten); Nonpayment of wages (Count Eleven); Unjust enrichment (Count Twelve); Tortious interference with contractual relations and/or prospective economic advantage (Count Thirteen); and Defamation (Count Fourteen). At the close of discovery, Defendants moved for summary judgment on each of these claims. ECF 54; ECF 55. In her opposition to these motions, Plaintiff withdrew Counts Two, Three, Four (with respect to hostile work environment only), Seven, Eight, Nine, Ten, Thirteen and Fourteen.[1] She maintains

---

[1] The Court notes that the numerical assignments for the counts identified in Plaintiff's opposition to Defendants' motions for summary judgment do not precisely track those in her amended complaint. Thus, the Court relies on the substance of her brief to deduce which counts Plaintiff continues to assert at this stage.

that the evidence produced in discovery establishes material disputes of fact precluding summary judgment on her remaining claims (namely, Counts One, Four (concerning disability discrimination), Five, Six, Eleven and Twelve).[2] For the reasons set forth below, Defendants' motions for summary judgment on Plaintiff's remaining claims are granted. Accordingly, the Court will enter judgment in favor of Defendants on all counts.

## Factual Background

Plaintiff applied for a position as a nail technician and aesthetician at the Spa at the Woodstock Inn on August 11, 2010.[3] Although Plaintiff had initially inquired about a position as a Wedding Coordinator with the Human Resources Department at the Woodstock Inn and Resort, she was told that that position had been filled and was referred to WTS instead. She applied for a position at the Spa and received an offer from WTS on August 16, 2010. Michelle Adams, the Spa director, trained Plaintiff for two weeks and oversaw her work thereafter. Plaintiff received a positive evaluation from her supervisors in her first annual

---

[2] Plaintiff failed to file "a separate, concise statement of disputed material facts" along with her opposition to Defendants' summary judgment motions, as required by Local Rule 56(b). However, her responses to Defendants' statements of undisputed facts contain some assertions of disputed facts. Although the lack of a separate statement of disputed facts has made the Court's assessment of the evidence more burdensome, the Court will nevertheless consider the substance of the Plaintiff's arguments in opposition.

[3] The Spa at the Woodstock Inn is owned by the Woodstock Resort Corporation. However, pursuant to a 2009 agreement between WTS and Woodstock Resort Corporation, WTS had authority to hire, fire, manage, discipline and terminate all Spa employees. ECF 54-34.

evaluation in September, 2011. On January 4, 2011, she sent
Adams an email stating that the Spa was "the best spa I have
ever worked at."

Between the time that she was hired and January 2012,
Plaintiff performed some work from home with Adams' permission.
However, she did not provide Adams with a record of her work
hours at home. In addition, Plaintiff testified that on
occasion, when employees arrived and clocked in early in order
to prepare for a shift, Adams would clock them out until their
shift began.

On January 28, 2012, Plaintiff slipped on ice and fell in
the parking lot as she was coming into work at the Spa. She
suffered a sprained ankle, foot and knee, and experienced back
pain as a result. After receiving treatment at the emergency
room at Mount Ascutney Hospital, Plaintiff quickly provided
Adams with a doctor's note stating that she would not be able to
return to work until February 6th. Before February 3rd, Plaintiff
provided Adams with a second note stating that she would need to
be out of work until February 13th. She testified that Adams
"lost her mind" at the news "because she didn't have anyone else
to cover." ECF 54-2, p. 35.

On February 8, 2012, WTS sent Plaintiff a letter stating
that she did not qualify for FMLA leave because she did not work

4

in a location where her employer had at least 50 employees within a 75 mile radius. ECF 54-9. The letter also provided that WTS would extend a personal leave of absence for up to three months, and instructed Plaintiff to discuss the amount of time that she would need with her supervisor. However, Plaintiff did not request additional leave pursuant to this letter beyond the time off she had requested between the time of her injury and February 13th. Plaintiff's salary continuation benefit payments from WTS' insurer, Traveler's Insurance Company, began in February 2012. On February 9th, Adams completed a form to authorize the application of Plaintiff's accrued paid time off for her leave on February 2nd and 3rd. A couple of months after her injury, Plaintiff filed a filed a worker's compensation claim with Travelers Insurance Company, challenging the amount of her benefit payment.

Plaintiff returned to work at the Spa on February 14th with the following medical restrictions: she could not use stairs, lift more than ten pounds, work for more than four hours a day, or perform pedicures. She sought accommodations from WTS for her sprained foot, knee and ankle, and informed WTS each time her physician altered her restrictions. The parties agree that Adams changed Plaintiff's schedule frequently thereafter, but dispute the cause of these changes. Defendant WTS asserts that, as the

Spa's lead therapist, Michelle D'Hooghe, testified, Plaintiff's schedule changed in response to her changing work restrictions. ECF 54-21. P. 16. Plaintiff disputes that her doctor's restrictions were changed "frequently," but does not present valid evidence that she was scheduled to work fewer hours than what her doctor allowed. ECF 56-1, p. 10. On February 11, Plaintiff was told that she would not be able to apprentice another employee after her injury until she returned to work full time. Finally, on February 14, 2012, WTS changed Plaintiff's employment status from full-time to part-time, in response to her reduced work hours.

On February 23, Plaintiff met with WTS and Woodstock Resort management staff about the way her injury was being handled at work. At that meeting, she objected to the last minute scheduling changes and to not being given notice of the change in her schedule, but not to the number of hours she was scheduled to work. She testified that she informed the management staff that she was under a lot of stress from work and that Adams screamed at her over the phone to pressure her to come in to work. On February 24, WTS provided Plaintiff with a letter from COBRA Control Services notifying her that her health benefits would be cut, and that she had the option to elect COBRA to continue her health benefits after her coverage was cut

6

on March 1.[4] Plaintiff did not respond to this letter. At that time, Plaintiff's medical expenses were paid by WTS' workers' compensation insurer. On February 28, Plaintiff was verbally coached for failing to sign off on a closing checklist of tasks.

On April 7, 2012, Plaintiff came to work approximately one hour before her scheduled shift and found that a client had arrived for an appointment that she hadn't been informed about previously. Plaintiff was very upset about the scheduling shift and signed a written resignation that day. Although Plaintiff alleged in her complaint that the Spa staff intentionally manipulated her schedule to ensure that she would fail to show up for an appointment, thereby providing an excuse to fire her, Defendant asserts that Plaintiff has no evidence that Spa staff had this intention. Plaintiff's response implies that such a motive can be inferred from the Spa staff's purported reason for failing to call her (namely, that the power went out), which she alleges "makes no sense." ECF 56-1, p. 16.

### Standard of Review

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ.

---

[4] Plaintiff was initially notified of the fact that her health benefits would be cut pursuant to the letter she received from WTS dated February 8.

P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (citing *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[O]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)) (internal quotations omitted). However, "a court is obliged not to consider inadmissible evidence at the summary judgment stage, [and] it remains in that court's discretion whether to strike the inadmissible portions or simply disregard them." *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010).

### Discussion

8

Plaintiff sustains that she is entitled to go to trial on her claim for (1) Interference under the PFLA (Count 1); (2) Disability discrimination under FEPA (Count 4); (3) Retaliation under FEPA (Count 5); (4) Retaliation for filing a workers compensation claim (Count 6); (5) Unpaid wages under state law; and(6) Unjust enrichment. The Court addresses these in turn, and concludes that Defendants are entitled to summary judgment on each.

1. *Interference under Vermont's Parental Family Leave Act*

Count One of Plaintiff's amended complaint alleges that Plaintiff "attempted to exercise her rights under the ... PFLA," and that Defendants "interfered with, restrained and denied the exercise of Ms. Terino's medical leave rights" under state law. ECF 27, p. 29.  Federal courts are bound to apply state substantive law to a state claim. *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir. 1991). In the absence of authoritative law from the state's highest court, the Court must either (1) predict how the state's highest court would resolve the state law question, or, if state law is so uncertain that the Court can make no reasonable prediction, (2) certify the question to the state's highest court for a definitive resolution. *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005).

Defendant WTS asserts that unlike the federal FMLA,
Vermont's PFLA does not create a cause of action for
"interference." ECF 54-54, p. 3. The Vermont statute provides
that "an employer shall not discharge or in any other manner
retaliate against an employee who exercises or attempts to
exercise his or her rights under this subchapter." 21 V.S.A. §
473. That language directly tracks the retaliation provision in
the FMLA, which makes it unlawful for an employer to "discharge
or in any other manner discriminate against any individual for
any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a).
However, FMLA "interference" claims are established pursuant to
a separate provision, which makes it unlawful for employers to
"interfere with, restrain or deny the exercise of or attempt to
exercise, any right" established by the FMLA. *Id*. No parallel
provision appears in the Vermont act, and this Court could find
no Vermont case law contemplating such a claim.

Thus, the Court is left to predict how the Vermont Supreme
Court would rule on this issue. As Plaintiff points out, that
court has stated that "[b]ecause the PFLA is a remedial statute,
we construe it liberally to accomplish the Legislature's
remedial intent." *Woolaver v. State*, 175 Vt. 397, 404 (2003).
Moreover, Plaintiff correctly notes that Vermont courts have
construed provisions of the FEPA in accordance with

corresponding federal laws. *See Robertson v. Mylan Laboratories, Inc.*, 176 Vt. 356, 363 (2004) ("The standards and burdens of proof to be applied under FEPA are identical to those applied under Title VII of the United States Civil Rights Act.").

However, that Title VII serves as a reference for FEPA does not imply that an "interference" claim akin to the one in the FMLA applies in the context of the PFLA. First, the high court has followed this rule because "FEPA is patterned on Title VII of the Civil Rights Act of 1964." *Hodgdon v. Mt. Mansfield Co.*, 160 Vt. 150, 161 (1992). The Vermont Supreme Court has not made a similar determination about the FMLA's function as a blueprint for the PFLA. Second, the PFLA does not fall under FEPA, as Plaintiff appears to imply. *See* 21 V.S.A. §§ 470-74; 21 V.S.A. §§ 495-496a. At most, the PFLA's retaliation provision provides that the parallel retaliation provision in FEPA "shall apply to this subchapter." *See* 21 V.S.A. § 473. Thus, if the Court looks to a federal statute at all, the text of the state statute suggests that it should reference first the anti-retaliation provision in FEPA, and by implication the anti-retaliation measures in Title VII. Finally, even if the logic of looking to corresponding federal laws were to apply in the context of the PFLA, a comparison of the text of the PFLA and FMLA suggests that the remedy in the PFLA only tracks the scope of the anti-

11

retaliation provision in the FMLA. In other words, if the Court assumes that the legislature was intentional in crafting the PFLA with reference to the FMLA in mind, the absence of a corresponding interference provision in the PFLA would weigh against finding that such a claim exists in state law.

Nevertheless, even if the Court were to assume, for the sake of argument, that an interference claim is available under state law, this count would fail on the merits.[5] In order to make out an interference claim under the FMLA (which a hypothetical interference claim under the PFLA might track), Plaintiff must show "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Thus, for the sake of argument, the Court will apply these elements with respect to the eligibility criteria and substantive protections offered by the PFLA.

In order to establish that she was an eligible employee under the PFLA, Plaintiff must show that she was "continuously

---

[5] Plaintiff explicitly withdrew her claim for medical leave retaliation in her response to Plaintiff's motion, so the Court will not construe Count One as a retaliation claim. ECF 56, p. 1.

employed by the same employer for a period of one year for an average of at least 30 hours per week." 21 V.S.A. § 471(2). Plaintiff concedes that her time sheets for the year preceding her January 28, 2012 injury average approximately 26.5 hours per week. ECF 56, p. 4. She also concedes that she was required to record her time and to verify, on a weekly basis, that her time records were complete and accurate. ECF 56-1, p. 5. Yet, she argues that she met the 30-hour threshold because she was not paid for the unrecorded hours that she worked with Adams' approval, or for the time that she was on call but not scheduled for an appointment.

In order to determine whether an employee has proven sufficient work hours to establish eligibility under the FMLA, courts look to whether those work hours would be compensable under the Fair Labor Standards Act ("FLSA"). *See Donnelly v. Greenburgh Cent. School Dist. No. 7,* 691 F.3d 134, 144 (2d Cir. 2012). The Court notes, at the outset, that in determining the number of hours for purposes of employee eligibility under the PFLA, the Vermont Supreme Court has not made similar reference to the FLSA. *See Woolaver*, 175 Vt. 404. Nevertheless, assuming that the FMLA analogy continues to hold, and that therefore the Court is to apply the standards for compensable work under FLSA,

the evidence Plaintiff cites here is insufficient to survive
summary judgment.

First, Plaintiff's "on call" time does not meet the
standard for compensable work under FLSA. The Second Circuit has
noted that "the predominant benefit test is often applied in the
context of on-call time, where employees have sought
compensation for time spent "on call" because their employer
restricted their ability to use time freely for their own
benefit." *Singh v. City of N.Y.*, 524 F.3d 361, 368 n. 4 (2d Cir.
2008) (citing *Rutlin v. Prime Succession, Inc.,* 220 F.3d 737
(6th Cir.2000)). Thus, "whether an employee's expenditure of
time is considered work under the FLSA turns in part on whether
that time is spent predominantly for the benefit of the employer
or the employee." *Id.* at 368.[6] In *Rutlin*, the Sixth Circuit found
that "[t]he question in on-call cases is whether the employer's
restrictions on its employees' time prevent the employees from
effectively using the time for personal pursuits. To be
considered work time, an employee's on-call time must be
'severely restricted.'" 220 F.3d at 743–44. Here, Plaintiff has
not set forth facts showing that her personal activities were
severely restricted during her on-call time. Thus, she cannot

---

[6] In cases where employees seek compensation for break time, "courts have
distinguished between employer requirements that substantially hinder an
employee's ability to use the time freely and those requirements that place
only a minimal burden on the employee's use of time." *Id.*

simply use the fact that she was considered a full-time employee at the Spa as proof that she was "on call" for at least 35 hours per week and calculate her compensable time on this basis.

Second, to the extent that Plaintiff contends that she met the 30-hour threshold because she actually performed tasks for at least that much time on an average week, she has failed to set forth facts sufficient to support this element of her claim. The Court will continue to look to FLSA to determine whether Plaintiff has met her burden at this stage. "[W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes," the U.S. Supreme Court has established a burden-shifting framework to determine an employee's amount of compensable time. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946). Even where an employee is under an obligation to correct time record deficiencies, the Second Circuit has found that the *Anderson* framework applies so long as an employer knows or has reason to know that the employee is working uncompensated hours. *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 363 (2d Cir. 2011).

Pursuant to that framework, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work

as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to [negate] the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687. "[I]t is possible for a plaintiff to meet [her] burden through estimates based on [her] own recollection" under this standard. *Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 362 (2d Cir.2011). However, there must be credible evidence that she performed overtime work and of the amount of such work. *Daniels v. 1710 Realty LLC*, 497 F. App'x 137, 139 (2d Cir. 2012).

In this case, Plaintiff initially testified in her deposition that she could not provide an estimate of the amount of time that she worked off the clock for which she was not compensated. Thus, she failed to meet even the minimal standard laid out in *Kuebel*. In an affidavit attached to her response to Defendants' motions, Plaintiff now states that, in addition to the estimated on-call time she provides, she should have been paid for an extra 30 minutes each day that she worked to account for the time it took her to prepare and clean up two treatment rooms. She also provides a calendar, apparently produced by her, which appears to represent the number of hours she worked from home on particular days. See ECF 56-10. The Court will not

consider this affidavit or calendar for purposes of creating a material dispute of fact to avoid summary judgment. As the Second Circuit has noted, "[i]t is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999). Here, Plaintiff's attempt to set forth a methodology for calculating her unpaid time, as well as her calendar representation of her unpaid time, would directly contradict her testimony that she could not provide an estimate of her time worked off the clock. Since Plaintiff has failed to demonstrate that, contrary to what her timesheets state, she in fact worked an average of at least 30 hours per week over the course of the year prior to her injury, she cannot be considered an employee within the meaning of the PFLA. As such, her first claim for interference with PFLA rights must fail.

2. *Disability Discrimination under Vermont's Fair Employment Practices Act*

Next, Defendant moves for summary judgment on Plaintiff's claim of disability discrimination pursuant to state law. The non-withdrawn portion of Count Four of the amended complaint asserts that Plaintiff could perform the essential functions of

her job with reasonable accommodations, but that Defendants
failed to make such reasonable accommodations. ECF 27, p. 30. It
also alleges that Plaintiff suffered adverse employment actions
because of her disabilities, and that the circumstances
surrounding those actions permit an inference of discrimination.
*Id.* However, in her opposition, Plaintiff only continues to
argue that Defendant WTS failed to accommodate her disability in
accordance with state law. ECF 56, p. 12-17.

FEPA provides that it shall be unlawful for an employer to
discriminate against a qualified individual with a disability.
21 V.S.A. § 495(1). The disability provisions of VFEPA "are
patterned after § 504 of the Rehabilitation Act of 1973, 29
U.S.C. § 794." *State v. G.S. Blodgett Co.*, 163 Vt. 175, 180
(1995). Thus, "federal case law provides guidance in construing
them." *Connors v. Dartmouth Hitchcock Med. Ctr.*, No. 2:10-CV-94,
2013 WL 3560946, at *5 (D. Vt. July 11, 2013); *see also Vail v.
Vermont Agency of Transp.*, No. 2012-339, 2013 WL 2631328, at *5
(Vt. May 8, 2013).

"To make [out] a *prima facie* failure to accommodate claim,
Plaintiff must show that (1) Plaintiff is a person with a
disability under the meaning of the VFEPA; (2) Plaintiff's
employer had notice of her disability; (3) with reasonable
accommodation, Plaintiff could perform the essential functions

of her position; and (4) the employer refused to make such accommodations." *Connors v. Dartmouth Hitchcock Med. Ctr.*, 12 F. Supp. 3d 688, 699–700 (D. Vt. 2014) (citing *McBride v. BIC Consumer Products Mfg. Co., Inc.,* 583 F.3d 92, 97 (2d Cir.2009)). FEPA defines an individual with a disability as "any natural person who: (A) has a physical or mental impairment which substantially limits one or more major life activities;(B) has a history or record of such an impairment; or (C) is regarded as having such an impairment." 21 V.S.A. 495d(5). A "qualified individual with a disability" means "an individual with a disability who is capable of performing the essential functions of the job or jobs for which the individual is being considered with reasonable accommodation to the disability," with exceptions for individuals who abuse drugs and alcohol. 21 V.S.A. 495d(6).

Defendant WTS asserts that Plaintiff's claim fails because she did not have a qualifying disability, citing federal case law suggesting that "temporary injuries," such as those suffered by Plaintiff, "do not trigger the protection of the ADA, and by implication, Vermont's FEPA." ECF 54-43, p. 14. Its argument sweeps too broadly, as state law does not impose such strict temporal limitations. *See e.g., Nadeau v. Mary Hitchcock Mem'l Hosp., No. 14-CV-64,* 2016 WL 3248266, at *7–8 (D. Vt. June 13,

2016) (concluding that Plaintiff's "post-termination health is immaterial" to whether he was disabled within the meaning of FEPA at the time he was terminated). Rather, the statute defines a "physical or mental impairment" broadly, encompassing "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting" a number of body systems, including the musculoskeletal system. 21 V.S.A. § 495d(7). Instead of judging a disability solely by its permanence, the statute requires courts to look at whether it substantially limits one or more major life activities[7] by looking to "the degree that the impairment affects an individual's employability." 21 V.S.A. § 495d(8). Likewise, in the cases cited by Defendant WTS, the temporary nature of the injury was relevant precisely to determine the degree to which an injury substantially limited the life activities of the person alleging disability. *See, e.g., Shaugnessy v. Xerox Corp.*, No. 12-CV-6158T, 2015 WL 1431687, at *3-4 (W.D.N.Y. Mar. 27, 2015) ("a temporary, non-severe injury does not constitute a disability under the ADA because such an injury does not substantially impair the person suffering the injury"); *Clark v. Boyd Tunica, Inc.*, 2016 WL 853529, at *4 (N.D. Miss. Mar. 1, 2016), *aff'd,* 665 F. App'x 367 (5th Cir. 2016) ("The issue remains, however, whether such

---

[7] "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, and receiving education or vocational training. 21 V.S.A. § 495d(9).

physical impairment "substantially limited" her major life activities.").

Here, there is at least a triable issue of fact concerning whether the injuries Plaintiff sustained as a result of her slip and fall substantially limited her major life activities. Plaintiff testified at her deposition that she couldn't move, get out of bed or go to the bathroom after her injury, and her doctors' notes imposed limitations on her ability to complete a full work day. These conditions sometimes improved and sometimes became worse over the course of her employment at the Spa. Viewed in the light most favorable to the Plaintiff these facts preclude the Court from concluding that Plaintiff was not an individual with a disability at the summary judgment stage.

Nevertheless, Plaintiff has failed to carry her burden with respect to the other elements of her prima facie case. WTS does not dispute that it had notice of Plaintiff's disability, but sustains that Plaintiff has adduced no competent evidence that WTS did not reasonably accommodate the work restrictions imposed by her physicians by scheduling her appointments around those restrictions. ECF 60, p. 8. Rather, Plaintiff argues that (1) Defendants failed to engage in an interactive process concerning Plaintiff's requests for accommodations; and (2) Defendants failed to accommodate her request to apprentice another

employee. Neither of these arguments is sufficient to preclude summary judgment.

First, the mere failure to sufficiently engage in a discussion about Plaintiff's requests for accommodation does not, in and of itself, violate FEPA. *See State v. G.S. Blodgett Co.*, 163 Vt. 175, 184 (1995) ("While we agree that defendants should conduct an individualized inquiry to determine whether a handicapped employee requires an accommodation in order to advance the goals of § 495d(6), there is no authority imposing liability for failure to conduct an adequate inquiry."); *McBride v. BIC Consumer Prod. Mfg. Co.,* 583 F.3d 92, 101 (2d Cir. 2009) ("The employer's failure to engage in such an interactive process, however, does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible."). In fact,  both Adams' and Plaintiff's deposition testimony establish that WTS engaged in significant back and forth conversations to accommodate the restrictions contained in eight doctors' notes over the course of less than two months. Adams also testified that she and Plaintiff "had a collaboration of how [they] could make this the best [they] could for her." ECF 54-20, p. 23. They talked about bringing guests to her and using a conveniently located room so that she could limit her walking on the job. Adams also wrote to

22

Plaintiff after D'Hooghe reminded her to complete the checklist, asking to speak further if there were items on the checklist that Plaintiff might need an accommodation for. Thus, even if the failure to engage in conversation were itself sufficient to show a failure to accommodate, there is no real dispute that Defendants did so engage in this case.

Nor did Defendants fail to accommodate Plaintiff by not permitting her to apprentice a coworker. Plaintiff had been responsible for training other employees before her injury, but she was not engaged in apprenticing her coworker prior to her fall. Rather, she testified that Defendants had merely agreed to permit her to do this down the road. ECF 54-2, p. 43. The Vermont Supreme Court has found that where a Plaintiff's proposal for accommodation "is tantamount to creating [a different] position[,] VFEPA does not contemplate such a result." *Id.* at 183. Thus, WTS' failure to permit Plaintiff to take on a new role after her injury does not constitute a failure to provide reasonable accommodations to perform her past job functions. Accordingly, Plaintiff cannot proceed to trial on this claim, either.

*3. Retaliation for Disability Discrimination Complaints under Vermont's Fair Employment Practices Act*

In order to make out a retaliation action under the VFEPA, "a plaintiff bears the initial burden of proving that she was engaged in a protected activity, that the employer was aware of that activity, that she suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action." *Connors v. Dartmouth Hitchcock Med. Ctr.*, 12 F. Supp. 3d 688, 699 (D. Vt. 2014) (citing *Gallipo v. City of Rutland*, 178 Vt. 244 (2005)). Plaintiff asserts that she engaged in a protected activity by (1) complaining to Defendants on February 23, 2012 that they were not providing her with reasonable accommodations; (2) complaining to Adams about not getting enough hours; (3) complaining that Defendants kept changing her schedule on the day that she quit; and (4) replying to her supervisor's verbal coaching about not being able to complete certain tasks because she wasn't given reasonable accommodations to do so. She asserts that she suffered the following adverse employment actions as a result: (1) a reduction in her hours; (2) verbal coaching; (3) constructive discharge and (4) the denial of the opportunity to apprentice a coworker. Notably, she does not argue that the reduction in her health benefits constituted retaliation for her alleged protected activity.

However, Plaintiff does not support the first three allegations of protected activity with sufficient evidence to withstand summary judgment. For example, in her opposition, she fails to cite to evidence that her hours were reduced in a manner that was inconsistent with her doctors' notes, which required such a reduction in work time. Although her response to Defendants' statement of undisputed material facts asserts that she "complained to WTS that they either scheduled her for too many hours or to [sic] little [sic] hours compared to her restrictions and scheduled on less desirable days and times compared to before her injury," her citation in that document does not support such an assertion. Rather, the hearsay evidence she sets forth merely provides that she complained about "her schedule always being changed" and that "her hours were reduced, her benefits were cut, and her schedule was constantly changing." ECF 56-12. Moreover, she testified that even in the February 23rd meeting, she did not object to the number of hours that she was scheduled to work. ECF 54-2, p. 46. The best evidence in support of Plaintiff's claim, which she does not point to in her opposition, is her own testimony that "[a]t times I was being scheduled – if I was on a three-hour restriction, [Adams] was scheduling me for four." ECF 54-2, p. 42. Even that statement, however, is not evidence of the adverse employment action she alleges here: a *reduction* of her work

hours. Finally, Plaintiff asserts that she never raised this issue with Adams, but acknowledged that every time her doctor changed her restrictions, she notified WTS about the change because they would have to schedule around her restrictions. *Id.* at 41.

In addition, she did not present evidence to contradict D'Hooghe's statement that she simply spoke to Plaintiff about completing the checklist, as she did with many other employees, because it was a brand-new procedure and she had to remind people of it. In fact, Plaintiff testified that when D'Hooghe spoke to her about this, "it was all based because I didn't sign the form," and that she "just forgot that they were hanging up in the closet – or in the cabinet." *Id.* at 51. Nor did she present evidence that she was harmed in any way by the conversation, which D'Hooghe testified did not amount to a warning. ECF 54-21, p. 16. Rather, Adams testified that her conversation with D'Hooghe about this issue resulted in them "moving some of the stuff around that was hindering [Plaintiff] from actually being to do that well." ECF 54-20, p. 24. Finally, she presented no facts at all to support her contention that her resignation constituted constructive discharge, or to sustain

her allegation that Adams intentionally manipulated her schedule to frame her as a no-show so that Defendant could terminate her.[8]

Even if Defendant engaged in adverse employment actions, Plaintiff fails to establish a causal connection between these actions and any protected activity. She argues that the causal connection is evidenced by (1) the fact that the alleged protected activity and adverse employment actions all occurred within a 2-month time span, and (2) her supervisor's comment that "they didn't believe she had been really injured." ECF 56, p. 20. In fact, however, the testimony Plaintiff cites does not provide evidence that any of her supervisors made such comments. Rather, lead therapist D'Hooghe admitted harboring her own doubts about Plaintiff's pain level because she had to remind Plaintiff several times to take the elevator rather than the stairs (a restriction Plaintiff's doctor imposed), but testified that she did not express these doubts or hear others making any similar comments. In addition, she stated that she and Plaintiff's other supervisor and coworkers consistently respected Plaintiff's scheduling restrictions and assisted Plaintiff with difficult tasks as needed.

---

[8] In her opposition, Plaintiff does not address the legal standard for constructive discharge. Based on the absence of factual citations to support Plaintiff's claim, the Court is satisfied that she has not carried her burden to show that WTS deliberately made [her] working conditions "so intolerable that a reasonable person would have felt compelled to resign." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010); *see also Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016).

Moreover, Plaintiff has not pointed to a timing arrangement
that would support a causal connection, because some of the
alleged adverse employment actions clearly took place prior to
her alleged protected activity. For example, Plaintiff was told
that she would not be able to complete an apprenticeship on
February 11, 2012, before she returned to work or engaged in any
of the alleged protected activities she sets forth. Similarly,
the reductions in her hours occurred pursuant to her doctor's
orders, many of which preceded the February 23rd meeting in which
she expressed complaints about the unpredictability of her
schedule. Finally, her complaint about the scheduling shift on
the day she presented her resignation could not have caused any
adverse action, since she did not engage with her employers
after that point. In short, Plaintiff has simply failed to
establish sufficient facts to provide even circumstantial
evidence that the alleged adverse actions were caused by her
protected activity. Defendants are thus entitled to summary
judgment on this claim.

4. *Retaliation for Filing a Workers Compensation Claim*

Plaintiff's claim of retaliation for filing a workers'
compensation claim fails for substantially the same reasons as
her disability retaliation claim. Vermont's Worker's
Compensation Act provides that "no person shall discharge or

discriminate against an employee from employment because such employee asserted or attempted to assert a claim for benefits." 21 V.S.A. § 710(b). "To withstand summary judgment regarding [her] claim that [s]he was discriminated against for filing a workers' compensation claim, plaintiff was required to present a prima facie case of retaliatory discrimination, namely, that (1) [s]he was engaged in a protected activity, (2) [her] employer was aware of that activity, (3) [s]he suffered adverse employment decisions, and (4) there was a causal connection between the protected activity and the adverse employment decision. Once plaintiff established a prima facie case of retaliatory discrimination, defendants were required to articulate some legitimate, nondiscriminatory reason for the challenged conduct; if defendants articulated such a reason, plaintiff was required to prove that the reason was a mere pretext." *Murray v. St. Michael's Coll.,* 164 Vt. 205, 210 (1995) (internal citation omitted). The parties agree that Plaintiff engaged in protected activity by filing a workers' compensation claim.

The adverse employment actions that Plaintiff points to substantially overlap with the actions she alleges in regard to her disability discrimination claim: namely, the denial of the apprenticeship, the reduction in hours, verbal coaching, and

constructive discharge. She also alleges that the discontinuation of her health insurance was an adverse employment action only for purposes of this claim. As noted above, Plaintiff has failed to present facts to support her claim that her work hours were reduced below what her accommodations required or that she was constructively discharged. She has, however, presented evidence that her health insurance was discontinued pursuant to a letter dated February 8, 2012, and that Adams did not permit her to apprentice her coworker pursuant to an email dated February 11, 2012. Both decisions were made within days of her injury on January 28 of that year. However, Plaintiff testified that she filed her workers' compensation claim "maybe a couple of months after [she] had come back to work from the injury." ECF 54-2, p. 13. Thus, by her own account, the adverse decisions predated the filing of the claim. As such, her filing of the claim cannot be the causal reason for these alleged adverse actions.

Even if Plaintiff could establish a causal link between these decisions and her workers' compensation claim through suspect timing, *Id.* at 212, her retaliation claim must fail because she cannot show that Defendants' proffered reasons for these decisions were pretextual. With regard to the decision to cut off Plaintiff's health insurance, Defendant stated that this

30

decision was due to a general policy that limited health
insurance benefits to full-time employees. Although the
reduction in work hours could be linked to Plaintiff's
disability, since it was implemented in response to her doctors'
orders, it is clearly independent of her decision to file a
workers' compensation claim. Similarly, Adams stated that the
decision not to permit Plaintiff to move forward to the
apprenticeship was caused by her reduced work hours, and
O'Hooghe testified that apprenticeships created significant
scheduling challenges. Moreover, O'Hooghe's testimony that she
harbored undisclosed doubts about how much Plaintiff was
actually suffering does not call into question Defendants'
proffered reasons, since she testified to having these doubts
months after these decisions were taken. Plaintiff does not
otherwise set forth evidence to prove that the proffered reasons
were pretextual. Accordingly, Defendants are entitled to summary
judgment on this claim, as well.

5. *Unpaid Wages under Fair Employment Practices Act*

    Finally, Defendants assert that they are entitled to
summary judgment on Plaintiff's claim for unpaid wages under
state law. First, Defendants argue that this claim must be
brought, if at all, pursuant to 21 V.S.A. § 342, which provides
that "[a]ny employer having one or more employees doing and

31

transacting business within the State shall pay each week, in
lawful money or checks, the wages earned by each employee to a
day not more than six days prior to the date of such payment,"
unless written notice is given or otherwise provided. As a
result, Defendants argue that Plaintiff's claim is time barred
by 12 V.S.A. § 520. Plaintiff claims that she brings her claim
pursuant to 21 V.S.A. § 384, which provides for the payment of
minimum wage and overtime and is subject to a six year statute
of limitations under 12 V.S.A. § 511.

To the extent that Plaintiff intended to bring a claim for
minimum wage pursuant to 21 V.S.A. § 384, rather than a claim
for unpaid wages, she has failed to set forth facts to support
that claim. Although in her affidavit, Plaintiff claims that she
should have been paid for an extra 30 to 45 minutes for each day
she worked, she does not establish (or even allege) that the
lack of payment for this amount would have set her average wage
rate at below the state minimum wage for any specific week or
time period. Nor can the Court deduce as much simply by looking
at her paychecks, which do not identify how many days Plaintiff
worked on any particular week. Thus, to the extent that
Plaintiff intended to bring a claim for minimum wage violations,
she has failed to set forth facts to this effect. To the extent
that Plaintiff brings her claim pursuant to 21 V.S.A. § 342, her

32

claim would be time-barred. *See* 12 V.S.A. § 520. Finally, even if Plaintiff's claim for unpaid wages were not time-barred, she has failed to establish that she meets the minimal standard to specify the number of hours for which she seeks compensation pursuant to *Anderson*, 328 U.S. 680 (1946) and *Kuebel*, 643 F.3d 352 (2d Cir. 2011), as discussed above. Accordingly, Defendants are entitled to summary judgment on count eleven of the amended complaint.

*6. Unjust Enrichment*

Finally, Plaintiff's last claim for unjust enrichment fails for substantially similar reasons. "Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable. Unjust enrichment applies if in light of the totality of the circumstances, equity and good conscience demand that the benefitted party return that which was given." *Kellogg v. Shushereba*, 194 Vt. 446, 458 (2013) (internal citation omitted). Defendant argues that Plaintiff's claim cannot survive summary judgment because (a) she has no competent evidence of unpaid wages; and (b) her unjust enrichment claim is duplicative of her claim for unpaid wages, for which she waived the statutory remedy by failing to timely file her claim.

As explained above, the evidence Plaintiff presents in support of her claim for unpaid wages is insufficient to meet the standards established in the context of FLSA. *Anderson*'s burden-shifting framework does not apply for purposes of making out a claim under Vermont common law. Even still, the only valid evidence the Court can consider in this regard is Plaintiff's testimony that she performed some unpaid work but cannot identify how much. She has thus failed to identify the nature of the benefit she conferred on WTS.

However, even if the Court were to permit the Plaintiff to make out an unjust enrichment claim without establishing the particular amount that she worked without pay at this stage, her claim would fail for a different reason. The Vermont Supreme Court has held that "where there was an express contract between the parties setting forth the terms of plaintiff's employment, there could be no implied contract on the subject." *St. Ambroise Azagoh-Kouadio v. Roman Catholic Diocese of Burlington*, No. 2016-266, 2016 WL 7364740, at *4 (Vt. Dec. 16, 2016) (citing *Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc.*, 149 Vt. 37, 38-39 (1987) (recognizing that there may be implied quasi contract created when express contract becomes unenforceable and unjust enrichment has occurred)). That approach has also been followed in other states in the context of unpaid wage claims. *See, e.g.,*

34

*In re Wage Payment Litig.*, 759 A.2d 217, 224 (Me. 2000) (ruling that "contract of employment between the parties precludes the plaintiffs from maintaining a cause of action for unjust enrichment"); Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."). Since Plaintiff's wages were governed by an employment contract, she cannot succeed on her claim for unjust enrichment.

### Conclusion

For the foregoing reasons, the Court **grants** summary judgment in favor of Defendants on each of Plaintiff's remaining claims, and on each claim that Plaintiff has withdrawn. Accordingly, the Court will enter judgment in Defendants' favor on every claim in Plaintiff's amended complaint.

Dated at Burlington, in the District of Vermont, this 28th day of June, 2017.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge